# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-80748-CIV-ROSENBAUM
Consent

JAMES C. DAVIS,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____/

## ORDER

## *I. INTRODUCTION*

This matter is before the Court on the cross-motions for summary judgment filed, respectively, by Plaintiff James C. Davis ("Claimant") and by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"). [D.E. 15 and 23]. The motions were referred to me pursuant to 28 U.S.C. § 636 and Magistrate Rules 1(c)and (d), Local Rules of the United States District Court for the Southern District of Florida. [D.E. 3]. Subsequently, the parties consented to disposition of this matter by a United States Magistrate Judge. [D.E. 13].

The cross-motions present the following issue: whether substantial evidence exists to support the Commissioner's determination that Claimant is not disabled under the Social Security Act and whether the proper legal standards were applied. Under the limited standard of review that governs this case, the Court finds that substantial evidence supports the Commissioner's determination. Thus, Plaintiff's Motion for Summary Judgment [D.E. 15] should be denied, Defendant's Motion

for Summary Judgment [D.E. 23] should be granted, and the Commissioner's decision should be affirmed.

## II.  PROCEDURAL HISTORY

Claimant filed an application for supplemental security income ("SSI") benefits on July 31, 2006, under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381, *et seq*. (Tr. 103-05).  Claimant allegedly became disabled as of November 12, 2004, due to, as stated in his Disability Report, a herniated disc, aneurysm, abdominal hernia, high blood pressure, possible arthritis, Bell's Palsy, and high cholesterol.  (Tr. 128).  The Social Security Administration ("SSA" or "Administration") denied the application initially and upon reconsideration.  (Tr. 89-91; 97-99).

Thereafter, Claimant requested and was granted a hearing before an Administrative Law Judge ("ALJ").  (Tr. 74–78).  On December 4, 2007, in West Palm Beach, Florida, Claimant appeared before Administrative Law Judge M. Dwight Evans and testified to his impairments. (Tr. 14–58).  Thereafter, on March 28, 2008, the ALJ issued a decision finding that Claimant retained the ability to perform light to medium work, including his past relevant work as a floor technician, ramp agent, and driver. (Tr. 72–73).  Accordingly, the ALJ concluded that Claimant is not under a "disability" as defined in the Social Security Act and denied Claimant's application for benefits. (Tr. 73).

Claimant later requested review by the Appeals Council of the unfavorable ALJ decision. (Tr. 62).  On February 18, 2009, the Appeals Council granted Claimant's request to review the ALJ's decision.  (Tr. 10–13).  On April 24, 2009, the Appeals Council issued an opinion in which it adopted the ALJ's findings that Claimant was not disabled, but slightly modified the ALJ's opinion. (Tr. 5).  Therefore, the decision of the Appeals Council stands as the final decision of the

Commissioner.

Claimant filed this Complaint [D.E. 1] seeking reversal of the Commissioner's final decision, and the Commissioner filed an Answer.  [D.E. 9].  After the Court issued an Order setting Briefing Schedule, Claimant filed his Motion for Summary Judgment [D.E. 15], the Commissioner filed his Motion for Summary Judgment [D.E. 23], and Claimant later filed his Response to Defendant's Motion for Summary Judgment. [D.E. 25].  This matter is, therefore, ripe for disposition.

### III.  FACTS

#### A.    General Background

Claimant was born on July 21, 1964, and was 40 years old at the time of the onset of his claimed disability (*i.e.*, November of 2004). (Tr. 103).  Claimant is not currently working, but has past relevant work experience as an auto parts driver, ramp agent, maintenance worker, floor technician, landscaper, and automobile technician.  (Tr. 22, 25, 48-49; 148; 129; 134).  Claimant alleges that he has not been able to work since 2004 due to a herniated disc, aneurysm, abdominal hernia, high blood pressure, possible arthritis, Bell's palsy, and high cholesterol. (Tr. 128).  He alleges that the combined pain from these conditions prevents him from walking or standing for any reasonable length of time. (Tr. at 37-39).

Claimant suffers from back pain which stems from the injury of his lower back and neck when he was involved in a workplace accident and three subsequent car accidents.  Claimant first injured his back in 1991 while he was working as a floor technician at Bush Brothers, a provision company.  (Tr. 27).  More specifically, Claimant injured himself when he attempted to lift a 90-pound box of frozen meat and strap that Claimant used to assist him with lifting the box broke.  (Tr. 27-28).  Due to this injury and resulting back pain, Claimant was seen and treated by various doctors.

*Id.*

In 2000, while working for Ramada as a maintenance worker, Claimant injured himself in a car accident while on his way home from work. (Tr. 49). According to Claimant, his car became "sandwiched" between two cars when he stopped and the vehicle behind him hit Claimant's car, forcing it to hit the car in front of Claimant. (Tr. 27; 49-50). Likewise, Claimant was involved in two additional car accidents while later working as an auto parts driver for a Nissan dealership. (Tr. 24-25). Specifically, Claimant explained that the first accident occurred when he struck another vehicle while pulling out onto a major thoroughfare (US-1) and hit the back end of a car that had cut across in front of him. (Tr. 24). The second car accident occurred in 2004 when the accelerator on Claimant's car became jammed, causing Claimant's car to hit another vehicle. *Id.* Since that time, Claimant contends, he has had pain, tingling, and numbness resulting from his back, head, and neck injuries. (Tr. 46).

In addition to Claimant's neck and back pain, Claimant avers that he suffers from pancreatitis, aneurysms, and gouty arthritis. The Transcript reflects that sometime in 2004 or 2005, Claimant visited the emergency room, where the attending physician discovered that Claimant suffered from pancreatitis[1] and an abdominal aortic aneurysm.[2] (Tr. 28–29). Claimant underwent surgery in January 2005 to repair the aneurysm and alleges that he suffers from considerable pain at the incision site in his groin area as a result of the surgical procedure. *Id.;* (Tr. 39). In 2005,

---

[1] Pancreatitis is the inflammation of the pancreas. As a result of this inflammation, the digestive enzymes located in the organ attack the tissue that creates them. *See* http://www.medicinenet.com/pancreatitis/article.htm.

[2] An abdominal aortic aneurysm is the localized widening of the aorta, one of the largest arteries used to transport blood from the heart to the rest of the body. The aneurysm is located below the diaphragm. See http://www.medicinenet.com/abdominal_aortic_aneurysm/article.htm.

Claimant returned to the emergency room after his legs had swollen to the point where Claimant alleges that he was unable to walk. (Tr. 41). During this visit, the emergency room physician diagnosed Claimant with acute gouty effect[3] in his right ankle. (Tr. 199). Claimant asserts that he experiences flare-ups of this gouty arthritis. (Tr. 41). Finally, in 2006, Claimant was diagnosed with popliteal aneurysms[4] in the calves of both legs. (Tr. 29). The treating physician determined that the aneurysms required repair. At the time of the hearing before the ALJ, however, Claimant had not yet undergone surgery. Claimant asserts that he is unable to work as a result of the pain stemming from multiple injuries to his back, the residual problems from the surgical procedure, the flare-ups of the gouty arthritis, and the popliteal aneurysms.

**B.    Medical Evidence/Treating Physicians**

Claimant has been treated for various injuries and conditions. For simplification of the evidence relating to Claimant's medical condition, the medical evidence will be set forth below by condition, primarily in chronological order.

**1.    Pancreatitis/Gall Bladder**

In the fall of 2002, Claimant visited the emergency room at St. Mary's Medical Center, complaining of right upper quadrant abdominal pain associated with nausea and vomiting. (Tr. 183). Lab tests performed by the hospital showed elevated pancreatic enzymes, an ultrasound revealed

---

[3] Gout is a disease in which an overload of uric acid results in the deposit of tiny crystals in the tissues of the body, especially the joints. *See* http://www.medicinenet.com/gout/article.htm.

[4] Popliteal refers to the back of the knee. Thus, a popliteal aneurysm is an aneurysm located in the back of the knee. *See* http://www.medterms.com/script/main/art.asp?articlekey=4999

gallstones, and a CT scan reflected peripancreatic inflammation consistent with pancreatitis.  *Id.*  As a result, in October of 2002, Dr. Manuel Mendez ("Dr. Mendez") performed an elective laparoscopic cholecystectomy.[5]  (Tr. 183-85).  Since the removal of his gall bladder, Claimant has not suffered from any similar attacks.

### 2.      Neck and Back Pain

The first medical evidence in the record regarding Claimant's back pain, includes an MRI of Claimant's lumbar spine which was performed on June 30, 2004.  (Tr. 186).  The MRI revealed a mild bulging disc at L4-5 and L5-S1, but no disc protrusion, spinal stenosis, or foraminal stenosis.  *Id.*

Thereafter, on November 14, 2004, Claimant visited the emergency room of Jupiter Medical Center complaining of progressive pain and glove-like paresthesias[6] in his left hand.  (Tr. 187-89).  Claimant stated that he had been in an automobile accident two days earlier.  (Tr. 187).  Upon physical examination, the attending physician, Dr. Michael Collins, found that Claimant had the full range of motion in his neck, shoulders, and upper extremities, but noted tenderness in Claimant's cervical muscles at the occipital region.  *Id.*  An X-ray of Claimant's cervical spine revealed mild scoliosis, but otherwise, Claimant's spine was found to be normal.  (Tr. 188-89).  Dr. Collins diagnosed Claimant with a cervical sprain and discharged Claimant after treating him with Toradol and Norflex IM at the hospital.  *Id.*  Claimant received prescriptions for Vicodin, Anaprox, and Flexeril.  *Id.*

---

[5]     Laparoscopic cholecystectomy is a relatively low invasive surgery to remove the gallbladder.  *See* http://www.medicinenet.com/cholecystectomy/article.htm.

[6]     Paresthesias is a skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause.  *See* http://medical-dictionary.thefreedictionary.com/paresthesia

A few weeks later, Claimant saw Dr. Collins for an occupational health follow-up.  (Tr. 193). During the visit, Claimant reported that he suffered from persistent neck pain, headaches, and some paresthesias to his left hand.  *Id.*  Dr. Collins's impression was that Claimant had a cervical strain with paresthesias, and Dr. Collins found Claimant to have a 5% diminished range of motion in the neck.  (Tr. 193-94).  Dr. Collins indicated that he would request an MRI for Claimant and noted that Claimant was placed on modified sedentary duty only without any lifting, pending the results of the MRI.  *Id.*  Pursuant to Dr. Collins's request, an MRI was performed on December 7, 2004.  (Tr. 190). The MRI reflected mild multi-level degenerative changes in Claimant's spine.  *Id.*  More specifically, the MRI revealed mild end-plate hypertrophy and facet hypertrophy at C2-3, minimal end-plate hypertrophy at C3-4, minimal disc-bulge at C4-5, minimal disc bulge at C5-6, and a mild disc bulge at C6-7.  *Id.*

On December 9, 2004, Claimant returned to see Dr. Collins for a follow-up of his neck pain and paresthesias of his left hand.  (Tr. 191-92).  Dr. Collins reviewed the December 7, 2004, MRI and noted that the MRI revealed bulging discs at C4-C7 and some mild degenerative changes.  (Tr. 191).  Dr. Collins also noted that Claimant had an upcoming appointment with an orthopedic surgeon, as arranged by Claimant's lawyer.  *Id.*  Dr. Collins offered Claimant a refill on his Vicodin prescription and noted that a facsimile had been sent to Claimant's insurance adjustor indicating that Claimant's current work status included no lifting or overhead work.  (Tr. 192).

On June 7, 2007, Claimant presented to the emergency room at Wellington Regional Medical Center complaining of exacerbation of chronic lower back pain.  (Tr. 264-68).  While in the emergency room, Claimant rated his pain as a 6 out of 10.  (Tr. 265).  Upon physical examination, Claimant had reduced range of motion in his lower back, but was otherwise normal and displayed

full muscle strength.  (Tr. 266).  The attending physician prescribed Flexeril for pain and released Claimant in "good" and "stable" condition.  (Tr. 266).

Claimant returned to the emergency room at Wellington Regional Medical Center later that year on October 15, 2007, again complaining of lower back pain.  (Tr. 270-280).  The medical records reveal that Claimant experienced only "mild" back pain and that he had full strength in his extremities and no musculoskeletal problems.  (T. 274).  Claimant also displayed a steady gait and no neurological deficits.  *Id.*  The attending physician diagnosed Claimant with sciatica and chronic back pain and prescribed Flexeril, Lortab, and a Medrol pack.  (Tr. 277).  The hospital also conducted a venous Doppler ultrasound of Claimant's lower extremities, which revealed no evidence of deep vein thrombosis.  (Tr. 276).

A few weeks later, on November 11, 2007, Claimant presented to the emergency room of St. Mary's Medical Center complaining of pain and tenderness in his lower back, along with decreased range of motion. (Tr. 281-85).  This appears to be the last medical record in the administrative record relating to Claimant's back and neck pain.  During the November 2007, visit, Claimant reported that his symptoms were alleviated by nothing and were aggravated by movement.  (Tr. 281).  At their worst, Claimant stated that his symptoms were moderate – a 6 out of 10, and the treating physician found Claimant to be in "no apparent distress."  (Tr. 281-82).  Upon physical examination, Claimant had pain in his neck with movement and at rest, decreased range of motion in his back, and pain in his back with movement and at rest.  *Id.*  Pain was noted in both Claimant's mid and lower back. (Tr. 282).  Normal spinal alignment was noted, and Claimant did not display any muscle spasm and his straight-leg raises were negative for pain.  *Id*.  Ultimately, the attending physician diagnosed Claimant with a neck and back sprain and prescribed Toradol for pain.  (Tr. 283).  Claimant was

discharged in stable condition with instructions to take Motrin as needed. *Id.* The physician also prescribed 15 tablets each of Percocet and Flexeril for Claimant to take for the next few days. *Id.*

### 3. Abdominal Aortic Aneurysm

On August 21, 2005, Claimant visited the emergency room of St. Mary's Medical Center and was admitted with complaints of abdominal pain. (Tr. 195). Laboratory studies revealed an abdominal aortic aneurysm without rupture. *Id.* Additionally, the attending physician, Dr. Sheela Shah, diagnosed Claimant with acute pancreatitis, hypertension, hyperglycemia, hypomagnesemia, and hyperlipidemia. (Tr. 196). Claimant remained at the hospital until he was discharged on August 24, 2010. (Tr. 195). Upon discharge, Claimant was instructed to engage in activity as tolerated, but advised not to engage in any heavy lifting. (Tr. 195-97).

A few months later, on December 16, 2005, Claimant saw Dr. Manuel Mendez[7] to discuss Claimant's abdominal aortic aneurysm. (Tr. 202, 208). During the consultation, Dr. Mendez noted a familial history of abdominal aortic aneurysm in both Claimant's mother and father. (Tr. 208). Dr. Mendez also noted that Claimant had developed an umbilical hernia after having his gall bladder removed. *Id.* After consulting with Claimant, on January 5, 2006, Dr. Mendez performed an endovascular[8] abdominal aortic aneurysm repair on Claimant at Good Samaritan Hospital. (Tr. 203-206).

---

[7]    The referring physician and co-surgeon on the case was Dr. Rudolph Scheerer. (Tr. 208).

[8]    Endovascular repair of abdominal aortic aneurysm is a minimally invasive technique using radiologically-guided insertion of stentgraft to bypass the abdominal aortic aneurysm. *See* http://www.medicinenet.com/abdominal_aortic_aneurysm/page5.htm. Dr. Mendez advised against the endovascular surgical method in favor of the open approach. (Tr. 207), but Claimant chose the endovascular procedure citing a prolonged recuperation time when his parents had undergone the open procedure. *Id.*

On January 16, 2006,  Claimant saw Dr. Mendez for a follow-up visit, during which Dr. Mendez noted that Claimant denied any significant discomfort and appeared to be healing well.  (Tr. 207).  Dr. Mendez told Claimant that he felt that everything was working well after the endograft repair of his abdominal aortic aneurysm, but that he wanted to meet with Claimant again to discuss an umbilical hernia repair.  *Id.*  In furtherance of the hernia repair, Claimant underwent an abdominal CT scan on February 3, 2006, which revealed no abnormalities in the pelvis, but did reveal post-operative changes and confirmed the placement of a stent. *Id.*

Repeat CT scans of Claimant's abdomen conducted in March of 2006 and August of 2006, revealed no changes in the stent, but did show small calculi in both of Claimant's kidneys without obstruction.  *Id.;* (Tr. 216)*.*

### 4.    Gouty Arthritis

On September 6, 2005, Claimant presented to the emergency room at St. Mary's Medical Center and was admitted with complaints of right lower extremity pain.  (Tr. 199-201).  Claimant explained that the pain in his right ankle and toe was caused by a fall and had become so severe that he could not walk.  (Tr. 199).  The attending physician, Dr. Silvia Udvari Nagy, diagnosed Claimant with acute gouty effect on the right lower extremity at the ankle and opined that it was  induced by trauma.  (Tr. 200).  Dr. Nagy's report reflects that Claimant had a prior history of gout, but notes Claimant's uric acid was only slightly elevated.  *Id.*  After assessing Claimant, Dr. Nagy prescribed colchicine therapy[9] at three-day intervals and prednisone, only if Claimant did not respond to the colchicine treatment.  (Tr. 201).

---

[9]    Colchicine is a substance found in a plant that is used in the treatment of gouty arthritis.  *See*  http://www.medterms.com/script/main/art.asp?articlekey=2775.

-10-

### 5.    Popliteal Aneurysms

On April 25, 2007, Claimant underwent a venous ultrasound of his left lower extremity.  (Tr. 253).  The ultrasound revealed that Claimant had bilateral popliteal artery aneurysms, but no evidence of left lower extremity deep vein thrombosis.  (Tr. 253).  Subsequently, on May 17, 2007, Claimant had a CT angiography of his abdomen and bilateral lower extremities.  (Tr. 256).  The CT report indicated that Claimant was "status post prior aortic stent graft procedure" relating to the repair of his aortic aneurysm and revealed no significant stenosis or artherosclerotic irregularity.  *Id.*  Additionally, the CT confirmed bilateral small popliteal artery aneaurysms without thrombsis.  (Tr. 257).  Further, the test showed non-obstructing small left renal calculus and disclosed that Claimant was status post prior gall bladder removal.  *Id.*

Dr. Mendez's notes indicate that on November 19, 2007, Claimant underwent a bilateral lower extremity arterial duplex evaluation.  (Tr. 289).  The evaluation confirmed bilateral popliteal aneurysms but did not display any evidence of significant artherosclerotic stenosis.  *Id.*  Dr. Mendez noted no evidence of significant changes in either aneurysm in terms of diameter by duplex criteria.  *Id.*  Dr. Mendez also found normal arterial flow in the right lower extremity with some tibial occlusive disease on the left.  *Id.*  Based upon these results, Dr. Mendez recommended that Claimant follow up with another ultrasound in one year unless new symptoms developed.  *Id.*

### 6.    Timothy Toward, D.O.

Claimant saw his treating physician, Dr. Timothy Toward, from November of 2005 through December of 2007, for various reasons.  (Tr. 231-240; 290-93).  During these visits, Claimant reported swelling in his left hand and foot, as well as lower back pain, knee pain, and toe pain.  *Id.*  Dr. Toward's treatment notes regarding Claimant reveal that Claimant continued to complain of pain

-11-

throughout his treatment.  *Id.*  In response to Claimant's complaints of pain, Dr. Toward prescribed various medications.  (Tr. 231-37; 290-93).

## C.    Consultative Examinations

### 1.    Alan J. Marcus, D.O.

Claimant saw Dr. Alan J. Marcus for a consultative disability determination on October 17, 2006, at the request of the Commissioner.  (Tr. 220-222).  Dr. Marcus noted Claimant's history of hypertension, abdominal aortic aneurysm, and herniated discs secondary to motor vehicle accidents. (Tr. 220).  On the date of examination, Claimant's chief complaint was pain in his neck and back, as well as numbness in his hands while driving.  *Id.*  Upon examination, Dr. Marcus found Claimant to be in no acute distress.  (Tr. 221).  Claimant's deep tendon reflexes were equal and reactive bilaterally.  *Id.*  Claimant was able to ambulate without assistance and could ambulate on his heels and toes without difficulty, and had a normal gait.  *Id.*  Further examination of Claimant revealed an umbilical hernia, which was tender on palpation.  *Id.*  No edema or phlebitis was present.  *Id.*

Examination of the cervical spine disclosed a mild paravertabral muscle spasm in the cervical and lumbar areas.  *Id.*  Dr. Marcus found Claimant's fine motor movement to be normal and noted that no motor deficits were found.  *Id.*  Claimant's motor strength was 5 out of 5, his straight leg raising was normal, and his gait was normal and required no assistance.  *Id.*  Claimant's range of motion in his cervical spine was determined to be slightly reduced, and Dr. Marcus noted paravertebral muscle spasm in the lumbar spine.  *Id.*  Examination of the other major joints showed no evidence of deformity, pain, swelling, heat, redness, tenderness or any signs of inflammation.  *Id.*

Dr. Marcus's impression was that Claimant had a herniated disc in his cervical spine, mild reduction of range of motion of the cervical spine and paravertebral muscle spasm.  *Id*.  He opined

that Claimant would benefit from a hot pack, ultrasound, electrical stimulation, physical therapy, and muscle-strengthening techniques. *Id.* With respect to Claimant's lumbar spine, Dr. Marcus noted Claimant's previous history of injury with minimal loss of range of motion and mild paravertebral spasm. *Id.* Dr. Marcus felt that MRIs of Claimant's lumbar and cervical spine would be helpful for further evaluation. *Id.* With respect to Claimant's abdominal aortic aneurysm, Dr. Marcus found it to be "completely treated and healed at this time with a stent." *Id.* Dr. Marcus opined that Claimant's umbilical hernia needed surgical intervention and treatment, but that Claimant's history of recent pancreatitis had been resolved. *Id.* at 222. Finally, Dr. Marcus noted that Claimant was markedly overweight and would benefit from a weight loss program. *Id.*

## D.    Non-Examining Physicians/Residual Functional Capacity Assessments

### 1.    Donnell Eaton

Donnell Eaton, medical consultant to the State Agency of Florida, reviewed Claimant's medical history and completed a Physical Residual Functional Capacity ("RFC") Assessment on November 2, 2006. (Tr. 223-230). Eaton concluded that Claimant could occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry 10 pounds.[10] (Tr. 224). Eaton further concluded that Claimant could stand and/or walk for approximately 6 hours in an 8-hour workday and sit for a total of about 6 hours in an 8-hour workday. *Id.* Claimant's ability to push and pull, in Eaton's opinion, was unlimited, other than as shown for lifting and/or carrying. *Id.* Eaton cited

---

[10]    "Light work" is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time, but with some pushing and pulling of arm-hand or leg-foot controls. Social Security Ruling 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983).

specific facts in Claimant's medical records such Claimant's doctors' diagnoses to support these conclusions.  *Id.*

### 2.    Robert Whittier

Another state medical consultant, Robert Whittier, reviewed Claimant's medical history and completed an RFC Assessment on March 6, 2007, in connection with Claimant's application for SSI benefits.  (Tr. 245-252).  Based on a consideration of Claimant's medical history, Whittier concluded that Claimant could occasionally lift and/or carry up to 50 pounds and frequently lift 25 pounds.[11] (Tr. 246).  As for Claimant's ability to stand, walk, and sit, Whittier determined that Claimant could stand and/or walk for approximately 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. *Id.*  Whittier noted that Claimant was unlimited in his ability to push and pull, other than as shown for lifting and/or carrying.  *Id.*

### E.    Claimant's Testimony Before the ALJ

Claimant appeared and testified at an administrative hearing held before the ALJ on December 4, 2007.  (Tr. 14-57).  During the hearing, Claimant stated that he was forty-three years old and had never married or had children.  (Tr. 22, 51).  Claimant testified that he had completed up to the ninth grade in high school and had no subsequent specialized training.  (Tr. 22, 48).  With regard to his employment history, Claimant stated he had worked for Giant Food for approximately ten years (from 1981-1991) as a floor technician.  (Tr. 27).  Later, Claimant briefly worked as an auto technician at a car dealership in 1991 and then as a ramp agent at an airport from 1991-1992.  (Tr.

---

[11]    "Medium work" is defined as work that involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).  If someone can do medium work, that individual can also do sedentary and light work.

50).  Subsequently, Claimant worked for a provision company, Bush Brothers, when, in 1993, he

first injured his back while picking up a box of frozen meat.  (Tr. 27).  As Claimant explained, as

he attempted to lift the box of frozen meat, the plastic straps that he used to lift the box broke.  (Tr.

27-28).  Claimant filed a worker's compensation claim with respect to his back injury and received

an impairment rating of 5% before the claim was settled.  *Id.*  Claimant testified that he tried to find

work from 1993 through 1999, but was unable to do so due to his back problems.  *Id.*

Ultimately, Claimant found work as a landscaper and maintenance worker at a Ramada resort

in 1999.  (Tr. 28; 49).  In 2000, while working for Ramada, Claimant injured himself in a car

accident on his way home from work.  (Tr. 49).  Claimant stated that his car became "sandwiched"

between two cars when he stopped and the vehicle behind him hit Claimant's car, forcing it to hit

the car in front of Claimant.  (Tr. 27; 49-50).  Beginning in May of 2003, Claimant  worked as a car

runner for the Nissan auto dealership where his job duties entailed retrieving cars, driving cars, and

janitorial work, including emptying garbage, sweeping, and mopping floors.  (Tr. 25-26).  According

to Claimant, due to pain in his legs and feet, his employer changed his job position to an auto parts

driver.  *Id.*

Claimant testified that he was involved in two additional car accidents while working as an

auto parts driver.  (Tr. 24-25).  Specifically, Claimant explained that the first accident occurred when

he struck another vehicle while pulling out onto a major thoroughfare (US-1) and hit the back end

of a car that had cut across in front of him.  (Tr. 24).  According to Claimant, the second accident

occurred when the accelerator of his vehicle got stuck and he hit another vehicle.  (Tr. 24).  The

Nissan dealership terminated Claimant's employment following the second accident.  *Id.*

With respect to Claimant's claimed disability, he attested that he has constant pain in his

back, legs, and feet.  (Tr. 25, 34, 36-39).  Claimant stated that he could sit for only 20–30 minutes before having to shift positions.  (Tr. 37).  He also testified that he could walk approximately the length of "half of the front end of a grocery store" before experiencing intense pain  *Id.*  Next, Claimant  stated that he was unable to bend, crouch, crawl, kneel, or stoop without pain.  (Tr. 37–38).

When asked why he has not worked since 2004, Claimant asserted that medical problems continually arise and the accompanying pain prevents him from finding work.  (Tr. 28).  Claimant, however, admitted that no doctor has told him not to work.  (Tr. 51).  In 2004, Claimant was diagnosed with pancreatitis and an abdominal aortic aneurysm.  (Tr. 29).  Claimant explained that he underwent surgery in January of 2005 to repair the aortic aneurysm.  (Tr. 29).  Additionally, Claimant stated that in 2005, he was treated for gouty arthritis in his legs and noted that he experienced subsequent flare-ups since 2005. (Tr. 41).  Finally, towards the end of 2006, Claimant's doctor found that Claimant had popliteal aneurysms in both legs, which will require repair, but have not yet been repaired.  (Tr. 29-30).

Moreover, Claimant testified that he takes pain medication as well as prednisone when his doctor prescribes it for the pain in his ankles and back.  (Tr. 41).  He stated that he is concerned about driving because of the medications he takes since he has found himself becoming drowsy while driving and drifting off the road.  (Tr.  42).  He claims that he must elevate his legs for approximately two to three hours per day in order to alleviate his pain.  (Tr. 35).  And, when asked whether he would classify his condition as better, the same, or worse, Claimant stated, "I feel I'm getting worse at my age."  (Tr. 43).

Finally, Claimant explained that he lives with his parents and that his daily activities consist

of lying in bed or sitting while watching television or reading.  (Tr. 39, 43, 57).  Claimant is able to

bathe, shave, and dress himself but indicated that he is unable to do most chores such as cooking,

cleaning, and taking out the garbage.  (Tr. 35, 42).  He explains, however, that he tries to help his

parents out around the house by washing his own clothes.  (Tr. 54-55).  Claimant stated that he

drives a car whenever he feels well enough to do so and typically drives to the doctor's office or the

grocery store.  (Tr. 34).  In addition, Claimant attested that he walks for exercise whenever he his

legs and back do not cause him pain.  (Tr. 54).  Claimant stated that although he used to enjoy

bowling, now the only enjoyment he has in life is watching television or reading while sitting.  (Tr.

39).

**F.    The ALJ's Decision**

The ALJ rendered his decision on March 28, 2008.  (Tr. 73).  After evaluating the entire

record, the ALJ found that Claimant did not have a disability as defined under the Social Security

Act and was not entitled to disability benefits.  *Id.*  Specifically, the ALJ determined that Claimant

suffered from mild degenerative disc disease of the cervical and lumbar spine, morbid obesity,

status-post repair of abdominal aortic aneurysm, and umbilical hernia, a combination of impairments

considered "severe" based on the requirements set forth in 20 CFR § 416.920(c).  (Tr. 70).  These

impairments, however, did not meet or medically equal one of the impairments listed in Appendix

1, Subpart P, Regulation No. 4.  (Tr. 71).  Based on a review of the evidence, the ALJ found that

Claimant had the residual functional capacity to perform a full range of light work (*i.e.*, work that

requires lifting 10 pounds frequently, sitting for up to six hours in an 8-hour day, and standing and/or

walking for up to six hours in an eight-hour day). (Tr. 72–73).  In making his determination, the ALJ

found that Claimant's allegations regarding his limitations were not entirely credible and that he had

-17-

the ability to return to his prior work as a floor technician, ramp agent, or driver because as customarily performed, these jobs did not require the performance of work-related activities precluded by Claimant's residual functional capacity. (Tr. 73).

**G.    The Appeals Council's Decision**

As noted above, on February 18, 2009, the Appeals Council granted Claimant's request for review of the ALJ's decision. (Tr. 10-13). Ultimately, on April 24, 2009, the Appeals Council issued an unfavorable decision and found that Claimant was not disabled under the Act. (Tr. 5-8). In adopting the ALJ's conclusion regarding whether Claimant was disabled, however, the Appeals Council modified the ALJ's decision. More specifically, the Appeals Council agreed with the ALJ's findings under steps 1, 2, and 3 of the sequential evaluation – that Claimant has not engaged in substantial gainful activity since July 31, 2006, and that Claimant has severe impairments which do not meet or equal in severity an impairment in the Listing of Impairments. (Tr. 5). The Appeals Council found that Claimant could perform a full range of light work but disagreed with the ALJ's finding that Claimant was capable of performing his past relevant work as a floor technician, ramp agent, or driver. (Tr. 5-7).

Instead, the Appeals Council explained that Claimant's past work as a floor technician, ramp agent, and driver, as described by Claimant and according to the Dictionary of Occupational Titles ("DOT"), constituted medium to heavy work. (Tr. 6). Thus, the Appeals Council determined that these jobs exceeded Claimant's residual functional capacity for light work. *Id.* Additionally, the Appeals Council noted that Claimant had last performed the floor technician job in 1991, more than 15 years prior, and, hence, this position did not qualify as "past relevant work" pursuant to 20 C.F.R. 416.920(e). *Id.* Likewise, an earnings query indicated that the ramp agent position resulted in only

limited earnings and, thus, was not performed at the substantial gainful activity level.  *Id*.
Accordingly, the Appeals Council concluded that the floor technician and ramp agent jobs could not
be considered "past relevant work" as contemplated under the regulations.  *Id*.  Having found that
Claimant could not return to any of his past relevant jobs, the Appeals Council continued to the last
step in the sequential evaluation.

The Appeals Council considered the Claimant's statements concerning his subjective
complaints of pain and adopted the ALJ's conclusions, agreeing that Claimant's subjective
complaints were not entirely credible.  *Id*. at 6-7.  Next, the Appeals Council noted that at the time
of the ALJ's decision, Claimant was 43 years old (*i.e.*, a younger individual), had limited education,
and had past relevant work of a semi-skilled nature.  *Id*.  Considering these vocational factors
(Claimant's age, education, and work experience) and Claimant's residual functional capacity to
perform a full range of light work, the Appeals Council found Claimant not to be disabled because
a significant number of jobs that Claimant could perform exist in the national economy.  *Id*.
Accordingly, the Appeals Council concluded that Claimant was not under a "disability" as defined
in the Social Security Act. (Tr. 6-7).

## IV.  STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.
*Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).  The Commissioner's findings of fact must
be affirmed if they are supported by "substantial evidence.*"  Id.*; *Richardson v. Perales*, 402 U.S.
389 (1971).  "Substantial evidence" is more than a scintilla of evidence but less than a preponderance
and is such relevant evidence that a reasonable person might accept as adequate to support the
challenged conclusion.  *Id*. at 401, 91 S.Ct. at 1427; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.

1995); *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982).  The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239.  The scope of review is limited to an examination of the record only. *Reynolds v. Secretary of HHS*, 707 F.2d 927 (6th Cir. 1983).  If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards.  *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## *V.   ANALYSIS*

**A.      The Sequential Evaluation and Its Application by the ALJ**

Initially, a claimant has the burden of establishing that he or she is disabled under the Social Security Act.  *Walden*, 672 F.2d at 838;  *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991).  A "disability" is defined as an inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including the following: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age, education, and work history.  *Walden*, 672 F.2d at 839.

*Step One.*  To arrive at a determination as to disability, the ALJ must undertake the five-step

sequential evaluation embodied in 20 C.F.R. § 404.1520.  This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If so, a finding of "no disability" is made.  If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

At Step One, the ALJ found that Claimant had not engaged in substantial gainful activity since July 31, 2006, the date that Claimant filed his application for disability benefits.  (Tr. 70).  The ALJ then applied the facts, as he found them, to the sequential evaluation framework.

*Step Two.*  At the second step, the ALJ must determine whether the claimant suffers from a "severe impairment" or combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520©.  If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ will consequently find that the claimant is not disabled; if, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ will proceed to the next phase of the analysis.  *Id.*  Here, the ALJ found that Claimant's mild degenerative disc disease of the cervical and lumbar spine, morbid obesity, status-post repair of abdominal aortic aneurysm, and umbilical hernia constituted severe impairments within the meaning of the regulations. (Tr. 70).

*Step Three.*  The third step requires the ALJ to consider the "medical severity of [the claimant's] impairments" in order to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations.  20 C.F.R. § 404.1520(d).  Although the list is too voluminous to set forth here, the listings help to identify those claimants whose medical impairments are so severe that it is likely that they would be found disabled regardless of their vocational

background.  *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).  If the ALJ concludes that the impairments meet or equal one of those listed and meet the duration requirement, the ALJ will find the claimant disabled without considering age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(iii) & (d).  If not, the inquiry will proceed to the next stage.

In this case, the ALJ determined that Claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Appendix 1, Subpart P. (Tr. 71).  Accordingly, to find Claimant disabled, the ALJ needed to proceed to the next step in the analysis.

*Step Four.*  This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The Regulations define "residual functional capacity" ("RFC") as what an individual can still do despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).  This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others*.  Id.*  The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work.  If so, the ALJ will conclude that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv) & (f).

Here, the ALJ assessed Claimant's residual functional capacity to perform relevant work, and in doing so considered Claimant's subjective complaints as well as his treating physicians' medical records, the consultative examiners' records, and the Residual Functional Capacity Assessments. In reviewing the evidence, however, the ALJ found that Claimant's subjective complaints were not entirely credible to the extent alleged. (Tr. 72-73).  The ALJ also determined that Claimant's

allegations of total disability were not consistent with and were disproportionate to the record as a whole. *Id.*

Based upon his review of the entire record, including treating physician records and opinions of State Agency medical consultants, the ALJ found that Claimant retains the residual functional capacity to perform the full range of light work,[12] or work that involves frequent lifting or carrying of objects up to 20 pounds on an occasional basis and up to 10 pounds on a frequent basis. (Tr. 72). Utilizing this determination, the ALJ concluded that Claimant could return to his past relevant work as a floor technician, ramp agent, or driver. (Tr. 73). Accordingly, the ALJ concluded that Claimant is not under a "disability," as defined in the Social Security Act. *Id.* The ALJ, consequently, did not proceed to Step Five of the analysis.

On Appeal, however, the Appeals Council modified the ALJ's decision and, although it agreed that Claimant could perform a full range of light work, it found that Claimant's past relevant work was precluded by his capacity for nothing greater than light work. Thus, the Appeals Council proceeded Step Five of the analysis. At Step Five, the burden shifts to the Commissioner to demonstrate that other substantial gainful employment in the national economy exists that Claimant can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *Smith v. Schweiker*, 646 F.2d 1075, 1077 (5th Cir. 1981). If the Commissioner proffers possible alternative employment, the burden returns to a claimant to prove an inability to perform those jobs. *Id.* The Commissioner must

---

[12] As noted previously, "light work" is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). Even though the weight lifted in a particular light job may be very little, a job falls within this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls. Social Security Ruling 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983).

then resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. § 404.1520(f). Essentially, the Commissioner must determine whether other work is available in significant numbers in the national economy, which the claimant has the ability to perform. If the claimant can make the adjustment to other work, the Commissioner will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the Commissioner will determine that the claimant is disabled.

Here, the Appeals Council agreed with the ALJ that Claimant's subjective complaints of pain were not fully credible. In proceeding with Step Five of the analysis, the Appeals Council took into consideration Claimant's age, education, past relevant work, and residual functional capacity. (Tr. 7). Based upon these factors, the Appeals Council found that Claimant was not disabled because he could perform other jobs in the national economy. *Id.*

**B.**  **The ALJ's Decision is Supported by Substantial Evidence**

Claimant disputes the findings and conclusions of the ALJ and Commissioner, arguing that the ALJ improperly discounted Claimant's testimony regarding his subjective complaints of pain and improperly evaluated Claimant's claim at Step Five of the Sequential Evaluation.

**1.**  **ALJ's Credibility Analysis and Application of Pain Standard**

The Court first addresses the argument that the ALJ[13] erred by finding that Claimant's subjective complaints concerning his impairments and the extent of their impact on his ability to do any work activities at all, were not entirely credible.

---

[13]  As noted by Defendant in its Motion for Summary Judgment, although the Appeals Council's decision is the final decision of the Commissioner, the Appeals Council adopted the ALJ's findings regarding the credibility of Claimant's subjective complaints. (Tr. 6). Hence, it is appropriate to refer to the ALJ's decision with respect to the credibility analysis and pain standard.

In evaluating a claimant's subjective complaints, "pain testimony should be consistent with the degree of pain that could be reasonably expected from a determinable medical abnormality." *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991). An ALJ is required to apply a three-part pain standard when a claimant attempts to establish disability through pain or other subjective symptoms. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) evidence that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Id.* (citations omitted). Thus, a claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *See id.* at 1561. Other possible factors for consideration include the levels of medication and their effectiveness on the Claimant, the extensiveness of the attempts to obtain relief, the frequency of medical contacts, and the nature of daily activities. *Hargis*, 945 F.2d at 1489; *see also* 20 CFR §§ 404.1529 and 416.929.

The ALJ did not conclude that Claimant's complaints of pain were invalid. Instead, he found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but Claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they are inconsistent with the residual functional capacity assessment. In this regard, the ALJ found that although medical evidence did support the presence of some limitations, it did not support the presence of disabling limitations. If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See Walker*, 826 F.2d at 1004.

Here, the ALJ expressed the reasons for his discrediting of the Claimant's testimony on pain and the ALJ's analysis encompassed the requirements of the Eleventh Circuit pain standard.  It is important to note that a finding of disability requires more than the mere inability to work without pain. Rather, the relevant question concerns whether a claimant is credible to the extent that the described pain prevents him from performing substantial gainful activity.  *See Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996).

In this case, the ALJ highlighted discrepancies between Claimant's testimony and the information contained in documentary reports, reports in the record, the findings made on examination, and the totality of the evidence in the case, to support Claimant's subjective complaints. (Tr. 72-73).  With respect to the aneurysms in Claimant's popliteal arteries, the ALJ explained that no signs of thrombosis were found and, in fact, blood flow was determined to be normal. (Tr. 71).  The ALJ also concluded that the medical record did not substantiate the presence of any significant complaints of pain or limitation associated with the aneurysms.  *Id.*  Indeed, the ALJ specifically, found that the medical record did not corroborate any chronic leg pain, nor could this Court find such evidence, either.  (Tr. 72).

Likewise, the ALJ noted that Claimant had suffered from only three episodes of gout in a ten-year period, and the gout had been resolved with treatment.  (Tr. 71).  The ALJ also opined that the medical records did not substantiate significant pain associated with episodes of gout.  (Tr. 72).

With respect to Claimant's aortic aneurysm, Claimant underwent successful surgery completed by Dr. Mendez.  Significantly, during a January 2006 follow-up visit, Dr. Mendez remarked that Claimant denied any significant discomfort and appeared to be healing well.  (Tr. 207).  Dr. Mendez told Claimant that he felt that everything was working well after the endograft

repair of Claimant's abdominal aortic aneurysm.  *Id.*  And repeat abdominal CT scans in February of 2006, March of 2006, and August of 2006, revealed no changes in the stent placed during Claimant's surgical repair of the aneurysm.  (Tr. 216).  Finally, upon consultative exam, Dr. Marcus found Claimant's abdominal aortic aneurysm to be "completely treated and healed at this time with a stent."  (Tr. 221).

Next, the ALJ reviewed the medical evidence with respect to Claimant's alleged neck and back pain.  Although the ALJ concluded from the medical evidence that Claimant experienced chronic lower back pain, thus meeting the first prong of the pain standard (Tr. 70-72), the ALJ nonetheless found that Claimant's condition did not met the requirements of either of the last two prongs of the pain test. *See Foote*, 67 F.3d at 1560.  For the reasons described above, the record supports the ALJ's conclusion that the overall objective findings are not of such severity as to give rise to the immobilizing conditions and pain described by Claimant is supported by the record, which includes the medical opinions outlined above.

The ALJ complied with 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p in evaluating Claimant's complaints.  He considered Claimant's testimony, objective medical evidence, activities, work history, and treatment measures.  (Tr. 70-73).  Despite Claimant's allegations of severe pain, substantial evidence supports the conclusion that Claimant's medical condition was not of such a severity that it could reasonably be expected to give rise to the alleged disabling pain.  Specifically, substantial evidence exists in the examination records to show a pattern of effective pain management with medication.  As noted by the ALJ, Claimant's treatment has been relatively conservative and medical records reveal that medication relieves his pain. (Tr. 72).

For example, Claimant's visits to the emergency room show that medications helped ease

Claimant's neck and back pain.  In November of 2004, Dr. Collins diagnosed Claimant with a cervical sprain and discharged Claimant after treating him with Toradol and Norflex IM.  (Tr. 187). During Claimant's June 2007 visit, the physician prescribed Flexeril for pain and released Claimant in "good" and "stable" condition.  (Tr. 266).  During other visits, physicians diagnosed Claimant with a back sprain and again prescribed Flexeril and Toradol.  (Tr. 277, 281-85).  And although during his November 2007 emergency room visit, the physician prescribed Percocet, he only prescribed 15 tablets and instructed Claimant to take Motrin upon discharge.  (Tr. 283).  The record is devoid of any evidence that epidural injections were ever used or that any of Claimant's physicians suggested that Claimant undergo surgery for his back pain.  Thus, medical records show that Claimant's pain was reasonably managed with medication.  As a result, the ALJ properly considered Claimant's condition as non-disabling.  *See Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (citations omitted); *See also Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996).      Moreover, each time Claimant presented to the emergency room, he described his pain as moderate to mild. For example, on June 7, 2007, when Claimant went to the emergency room at Wellington Regional Medical Center, Claimant rated his lower back pain as a 6 out of 10.  (Tr. 265). Similarly, when Claimant returned to the emergency room at Wellington Regional Medical Center on October 15, 2007, Claimant experienced only "mild" back pain, and records show that he had full strength in his extremities and no musculoskeletal problems.  (T. 274).  Finally, on November 11, 2007, Claimant presented to the emergency room of St. Mary's Medical Center complaining of pain and tenderness in his lower back, but indicated that at their worst, his symptoms were moderate – a 6 out of 10.  (Tr. 281-82).  The treating physician also found Claimant to be in "no apparent distress."  *Id.*

Other objective medical evidence supports the ALJ's finding with respect to Claimant's

credibility.  Indeed, an MRI of Claimant's lumbar spine performed on June 30, 2004, revealed a mild bulging disc at L4-5 and L5-S1, but no disc protrusion, spinal stenosis, or foraminal stenosis.  (Tr. 186).  A subsequent MRI performed on December 7, 2004, showed only mild degenerative changes to Claimant's spine.  (Tr. 190).  More specifically, the MRI disclosed minimal disc-bulges at C4-7. *Id.* Likewise, an X-ray of Claimant's cervical spine performed on November 14, 2004, revealed mild scoliosis, but otherwise, Claimant's spine was found to be normal.  (Tr. 188-89).

Results obtained during physical examinations also support the ALJ's credibility determination.  During Claimant's November 14, 2004, emergency room visit, the treating physician found that Claimant had full range of motion in his neck, shoulders, and upper extremities.  (Tr. 187).  Likewise, during Claimant's June 7, 2007, emergency room visit, Claimant displayed only a reduced range of motion in his lower back but was otherwise normal and showed full muscle strength.  (Tr. 266).  Next, when Claimant returned to the emergency room on October 15, 2007, he had full strength in his extremities, no musculoskeletal problems, and a steady gait.  (T. 274).  Finally, on November 11, 2007, when Claimant presented to the emergency room, the attending physician found that Claimant had normal spinal alignment, did not display any muscle spasm, and his straight leg raises were negative for pain.  (Tr. 281-82).

In addition to the medical evidence, the ALJ noted that Claimant stopped working not as a result of severe pain, but for reasons unrelated to his alleged disability.  (Tr. 72).  In this respect, the ALJ emphasized that Claimant was fired after being involved in two automobile accidents while on the job and not due to any impairments.  *Id.  See e.g.*, *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (when claimant leaves work for reasons other than his medical condition, this fact is relevant to credibility determination).  Even more significant is the fact that Claimant applied for and received

unemployment benefits after his termination.  (Tr. 72).  The ALJ found that the collection of unemployment benefits by Claimant implicitly acknowledged that Claimant was physically ready and able to work.  *Id.  See Morrison v. Astrue*, 2009 WL 3295113 (S.D. Fla. Oct. 13, 2009) (claimant who applies for unemployment benefits holds himself out as being available, willing and able to work and, thus, the application undermines a claimant's credibility).

Finally, of significance to the ALJ was the fact that none of Claimant's treating physicians opined that Claimant was disabled or otherwise unable to work.  (Tr. 73).  In fact, no treating source has expressed an opinion regarding Claimant's functional capacity or the ultimate issue of disability.[14]  *Id.*  Even Claimant admitted during his testimony that no treating physician had advised him that he was unable to work.  (Tr. 51).  Instead, two medical consultants completed Residual Functional Capacity Evaluations (RFCs) and determined that Claimant could perform light to medium work.  (Tr. 224; 246).  Additionally, the Court notes that in October of 2006, Claimant underwent a consultative medical examination, during which Dr. Marcus found Claimant to be in no acute distress.  (Tr. 221).  Claimant's deep tendon reflexes were equal and reactive bilaterally.  *Id.*  Claimant was able to ambulate without assistance and could walk on his heels and toes without difficulty and had a normal gait.  *Id.*

Dr. Marcus's impression was that Claimant had a herniated disc in his cervical spine, mild reduction of range of motion of the cervical spine, and paravertebral muscle spasm.  *Id.*  He opined that Claimant would benefit from a hot pack, ultrasound, electrical stimulation, physical therapy, and

---

[14]     The Court is aware of Dr. Collins's December 2004 notation that a facsimile had been sent to Claimant's insurance adjustor indicating that Claimant's current work status was no lifting or overhead work.  (Tr. 192).  Dr. Collins, however, is not a "treating physician" because he did not see Claimant a number of times and over a long enough period to obtain a longitudinal picture of Claimant's impairment.  *See* 20 C.F.R. § 416.927(d)(2)(i) (2009).

-30-

muscle-strengthening techniques. *Id.* With respect to Claimant's lumbar spine, Dr. Marcus referred

to Claimant's previous history of injury with minimal loss of range of motion and mild paravertebral

spasm. *Id.* Finally, Dr. Marcus noted that Claimant was markedly overweight and would benefit

from a weight-loss program. *Id.*

Overall, the ALJ determined that the medical evidence of record did not support Claimant's

contentions. (Tr. 72-73). The ALJ cited to the lack of objective medical findings supporting

Claimant's contention that he suffers from severe pain. The ALJ also pointed to the fact that

Claimant had been prescribed relatively conservative treatment. Finally, in determining that

Claimant was not entirely credible, the ALJ found significant the fact that Claimant had applied for

and received unemployment benefits. In short, no indication exists that the ALJ did not properly

apply the law in evaluating the entire body of evidence in light of inconsistencies between

Claimant's assertions and other evidence in the record. Ultimately, although the ALJ found evidence

of an underlying medical condition, he concluded that the objective medical evidence did not

confirm the severity of the alleged pain arising from that condition. Because the ALJ articulated

explicit and adequate reasons for discrediting Claimant's subjective pain testimony and the record

contains substantial evidence to support that determination, the ALJ's finding cannot be disturbed

by this Court. *Foote*, 67 F.3d at 1562 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.

1986)).

## 2.      The Appeals Council's Use of the Grids

Claimant also argues that the Commissioner erred by relying on the "grids" when finding that

Claimant was able to perform a full range of light work. In this regard, Claimant asserts that the

record reveals that he was not able to perform a full range of work at any exertional level and that

he suffered from non-exertional impairments that would preclude the use of the grids at Step Five of the sequential evaluation.  More specifically, Claimant avers that the Appeals Council erred by not calling a vocational expert to testify as to which jobs Claimant could perform, given his "significant non-exertional impairments."  According to Claimant, pain is a non-exertional impairment that significantly limits basic work activities and renders the grids inapplicable.

As noted above, once Claimant establishes that he cannot return to his past relevant work, the burden shifts to the Commissioner to prove that Claimant is capable, considering his age, education, and work experience, of engaging in any other kind of gainful employment.  *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (citing *Syrock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985)); *See also Miller v. Commissioner of Social Security*, 241 F. App'x 631, 634 (11th Cir. 2007).  In attempting to meet its burden, the Commissioner may rely on the Medical Vocational Guidelines, 20 C.F.R. part 404, subpart P, appendix II (the "grids"), to establish other work in the national economy that Claimant is able to perform.  *Walker*, 826 F.2d at 1002.  "The grids are based on the claimant's residual functional capacity, age, education and work experience, and in cases where they apply, they direct a conclusion on the issue of whether the claimant is capable of performing substantial gainful activity in the national economy." *Patterson v. Bowen*, 799 F.2d 1455, 1458 (11th Cir. 1986).

Here, the Appeals Council determined that Claimant was no longer able to return to his past relevant work.  Thus, the burden fell on the Appeals Council to show that Claimant was capable of other gainful employment.  In meeting this burden, the Appeals Council relied on the grids and found that a significant number of jobs that Claimant could perform existed in the national economy.  (Tr. 6) It further noted that at the time of the ALJ's decision, Claimant was 43 years old, which is defined

as a younger individual.  The Appeals Council also pointed out that Claimant had limited or less

education and had past relevant work of a semi-skilled nature and noted that the issue of

transferability of work skills was not material to the decision.  Applying these vocational factors

along with Claimant's residual functional capacity to perform a full range of light work, the Appeals

Council determined that Claimant was not disabled.[15]  The Appeals Council relied exclusively on

the grids in making its determination and did not seek testimony from a vocational expert.

As explained by the Eleventh Circuit, the grids may not be relied upon in all instances.

Indeed,

> Exclusive reliance on the grids is not appropriate either when
> claimant is unable to perform a full range of work at a given
> functional level or when a claimant has non-exertional impairments
> that significantly limit basic work skills.  *Francis v. Heckler*, 749
> F.2d 1562, 1566 (11th Cir. 1985).  The grids may be used only when
> each variable on the appropriate grid accurately describes the
> claimant's situation.  *Smith v. Bowen*, 792 F.2d 1547, 1554 (11th Cir.
> 1986); *see* 20 C.F.R. § 1416.969; 20 C.F.R. pt. 404, subpt. P, app II
> § 200.00(a).

*Walker*, 826 F.2d at 1002-03; *see also Phillips v. Barhart*, 357 F.3d 1232, 1242 (11th Cir. 2004).  The

phrase "significantly limit basic work skills" has been interpreted to mean limitations that would

prohibit the claimant from performing a "wide range" of work at a given exertional level.  *Id.*  The

grids also may not be used "when the claimant's non-exertional impairments are severe enough to

preclude a wide range of employment at the level indicated by the exertional impairments."  *Id.*

(citations and emphasis omitted).  On the other hand, the grids may be relied upon despite certain

non-exertional impairments when those impairments are found to be not credible.  *Martin v.*

---

[15]  In applying the grids, the Appeals Council used its determination that Claimant could
perform a full range of light work and accepted the ALJ's conclusion that Claimant's subjective
complaints of pain were not fully credible.

*Railroad Retirement Bd*, 935 F.2d 230, 234 (11th Cir. 1991) (citing *Francis*, 749 F.2d at 1566-67).

With these principles in mind, the Court addresses Claimant's argument that testimony from a vocational expert[16] was necessary in this matter because Claimant's pain constitutes a non-exertional impairment that makes the grids inapplicable. The Court recognizes that pain is a non-exertional impairment that may limit a claimant's ability to perform a range of jobs. *Walker*, 826 F.2d at 1003 (citing *Francis*, 749 F.2d at 1566; *Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983)); *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The question in this case, then, is whether Claimant's pain was severe enough to limit his basic work activities and, therefore, preclude exclusive reliance on the grids. This determination centers around whether Claimant's subjective complaints of pain are credible.

After a thorough review of the record, the Court finds that Claimant's alleged non-exertional impairment (pain) is not severe enough to preclude application of the grids. In this case, the ALJ properly rejected Claimant's complaints of disabling pain. In finding that Claimant's allegations of pain were not credible, the ALJ also found that Claimant's subjective complaints of pain do not significantly limit his capacity to perform light work. Credibility determinations are for the Commissioner, not the courts. *Bloodworth v. Heckler*, 703 F.2d 1233, 1242 (11th Cir. 1983). The Court finds that the ALJ's evaluation of Claimant's credibility with respect to his allegations of disabling pain, as adopted buy the Appeals Council, addresses adequately whether Claimant's pain constitutes a non-exertional impairment. Because the Court has already fully addressed why the

---

[16] A vocational expert provides the ALJ with a realistic appraisal of the work that a claimant is capable of performing. When the ALJ utilizes a vocational expert, the ALJ will pose hypothetical questions to establish whether someone with the limitations that the claimant has will be able to secure employment in the national economy. *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) (citing *McSwain v. Bowen*, 814 F.2d 617, 619-20 (11th Cir. 1987)).

ALJ's credibility determination is supported by the record, it will not reiterate those reasons here.

Ultimately, after reviewing the record as a whole, including Claimant's testimony at the hearing and the medical evidence, the Court finds that substantial evidence supports the ALJ's finding of non-credibility.  Thus, the Appeals Council did not err in applying the grids, and vocational expert testimony was not required in this case.  *See Phillips*, 357 F.3d at 1243 (if non-exertional limitations do not significantly limit a claimant's basic work skills at a given level, testimony from a vocational expert is not required).  Indeed, because the ALJ found that Claimant's pain did not limit his ability to perform a full range of light work, exclusive reliance on the grids by the Appeals Council was appropriate.  *Coston v. Astrue*, 2010 WL 3834015 (S.D. Fla. Jul 13, 2010) (if the ALJ makes a determination that the non-exertional impairments do not significantly limit basic work skills, the ALJ may properly rely on the grids to determine if the claimant is disabled); *Sherman v. Astrue*, 2009 WL 1841604 at *8 (M.D. Fla. Jun 26, 2009) ("To preclude use of the grids, a limitation must significantly or severely restrict the ability to work.  Minor or merely possible restriction is insufficient.") (citations omitted).

## VI.   CONCLUSION

Claimant had a fair hearing and full administrative consideration in accordance with the applicable statutes and regulations.  Substantial evidence supports the Commissioner's findings.  For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment [D.E. 15] is **DENIED**, Defendant's Motion for Summary Judgment [D.E. 23] is **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

**DONE AND ORDERED** in Fort Lauderdale Florida, this 10th day of November, 2010.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:   Counsel of record

-36-